Mr. Breen, whenever you're ready, if everybody is settled, except for your colleague, he's settled enough. Yes. Thank you very much, Your Honor. It may have pleased the court. The methods claimed in the 809 patent at issue here are not fundamental building blocks of science and technology. They are not merely computerizing some business method or financial process, nor are they merely automating or somehow accelerating any existing known method. Rather, these methods claim the use of a new infrastructure for practicing pharmacy. What's new? What's new? The arrangement of the hardware and the way in which it is used. But there's no new hardware, right? You're using a computer over some kind of Internet or computer network with a camera. Well, the camera is not new. The computers, the workstations themselves are not new. And we don't presume to have invented the Internet. There is some custom verification software in there. But we do submit that… But that's not what you're claiming. What we're claiming is a specific arrangement of that hardware with verification software that's notably distributed and quite specific in that the verification software is hosted at the institutional pharmacy workstations. Accessible from via a website in claim one and via other means and other claims from a remote site and a workstation there. And we submit we should not have to reinvent a computer in order to have a usage of a computer that's somehow patent eligible. I think that's been clear since Diamond versus Deere. Well, it's also been pretty clear since Alice that and other more recent cases that if you have a business method and you automate it on a computer, even if it's a good automation, doesn't make it patent eligible. Why isn't this just a business method for looking for a remote verification of pharmacists? Well, the business method case law post-Alice have found those types of claims to be patent ineligible essentially because they are merely automating or accelerating via the use of standard computer technology practices that were known, routine, and conventional in the field. This is not such a case. We have overwhelming evidence that these practices were not known at all. The practice of having a pharmacist certify the work of a non-pharmacist wasn't a known business method? I mean, it sounds like it was not only known, but it was required by state law in most jurisdictions. Well, I would disagree with most jurisdictions. We only have evidence of the Texas Code here. But as far as what was required in that regulation, it was direct supervision and verification, which from the declaration of Dr. Anderson, the president of the Texas Pharmacy Board, he explains that is onsite, in-person, direct supervision. The idea of remotely supervising that process when the pharmacist is unavailable is a new concept. It was deemed innovative by the Texas Pharmacy Board. It caused a rule change as a result of that. So this is not simply taking the idea of supervision and verification and automating it. This is creating an entirely new infrastructure that hadn't been done before and providing— You keep saying entirely new infrastructure, but the infrastructure you're talking about is completely conventional pieces. It's a camera. It's the internet. It's a computer. Well, again, we do also have custom verification software, but Your Honor is referring to these elements individually. Well, let me ask you that because you keep saying custom verification software too. Is that what your claims are directed towards, custom verification software? Not entirely. That is one significant element. Point that to me in your claims because software may, it seems to be, be patent eligible if it's a specific improvement in computer technology.  It seems what you're claiming is simply this remote verification system. We're claiming the system as a whole, and again, we don't purport to have invented the individual components, but the order combination and usage of these elements as arranged, there is nothing in this record to suggest that that order combination, that series of steps reflects a practice that was known at all. Even the Texas Code doesn't suggest that, but certainly doesn't meet the level under Alice Prong, too, of being a routine, well-known, conventional practice. And really, I think that's one of the most fundamental problems we have with the judgment here. The procedural posture of this case, the procedural posture of this case was resolved on summary judgment. The only evidence offered by Baxter to show what was known in this field, what was done in this field, is the Texas Code. At best, the Texas Code shows that in 2001, for the first time, certain limited telepharmacy activities were permitted. Those limited telepharmacy activities— Before you go on, because it doesn't seem like you're taking me up on my invitation to show where you're claiming software, can I just assume you don't have claims limited specifically to this new verification software that you're talking about? You're claiming the whole ordered method. Is that right? We are, but the software is an integral part of that, because we claim the verification— Are there any claims that are specifically directed only to the software? Only to the software? No, Your Honor. The software is only ever claimed in the context of this distributed network system between the institutional pharmacy and the remote. I don't remember. Was there showing in your brief or in the specification or in the district court about the content of the verification software element of the claim? The content in terms of— What is this verification software doing? Well, the verification software does a number of things. I know it's verifying, but I need something a little—the next level of granularity. Well, I mean, the next level of granularity is, essentially, if you look at Claim 1, for example, all of the steps after the implementing verification software clause are facilitated by that verification software. And the verification software is noted that it's via one or more computers at the institutional pharmacy, so we have sort of a hosted software system there that is facilitating the rest of the entire method. So the transmission of the images, the storing of the images on the website, the ability for the remote pharmacist to access those images, all of those stuff, and then eventually to verify and send the indication. Mr. Green, is there anything new about this software? I mean, I see what it's doing, but is that—I mean, hasn't there been software that's been doing that in the past? Maybe in a different setting, but conveying these items. Well, there's no evidence in the record of any software that was doing all of these particular steps. Again, the only evidence that we have offered by Baxter—and again, this is summary judgment, Baxter's burden— the only evidence that we have is what the 2001 code contemplated, which didn't include all of the steps here, weren't directed to the context and the specific types of infrastructure to capture the information about sterile compounding, didn't involve the indication from the pharmacist and the corresponding indication at the institutional pharmacy. So I wouldn't say that on this record there's anything to show that this software is somehow old or conventional. Can you point to something in the specification that describes the content, anything about the content of the verification software? Sure, Your Honor. There are a handful of places. First, column 9, lines 38 through 43. What page? What page of the record? 839. I believe that's right, Your Honor. I'm looking at it. Oh, you're looking at it. Okay, 839, which reads, The institutional pharmacy site and the remote pharmacist site may be connected over the Internet via a custom protocol for viewing remote pharmacy work, such as may be implemented by remote verification software. So that's one example. A second example occurs, I believe it's a few pages later, at column 14, line 66 through column 15, line 5. Here we have a description. Did you say column what? Sorry? Column 14, line 66 through the first five lines of column 15, which reads, Custom software, such as remote verification software, configured specifically for communication and data exchange as part of remote verification of pharmacy functions, may provide a user interface for uploading, downloading, and or reviewing images stored on the site. So far the two things that you've pointed out sure read to me as though it's pointing to something old. It's a reference to used verification software. The skilled reader would know what that is. It must be in existence. We haven't described, we haven't created something new, some new piece of software yet. Well, I think the specification refers to it as custom verification software because there was no specific software that you could buy off the shelf that would facilitate this specific type of transaction of information and verifications. It was something that would have to be implemented so that the system could function as the claims require. But you directed our attention to the bottom of column 14, the top of column 15. It says remote verification software configured specifically for communication and data exchange as part of remote verification of pharmacy functions, etc. And sort of picking up maybe on what Judge Serrano was saying, what is new about that? I mean, that's just software in the familiar communication Internet scenario. Well, I guess if we're taking each thing that this software can accomplish, transmitting information, we're not purporting to have invented transmitting information. We're not purporting to have invented receiving information. But the verification software does a lot of steps all together that are a custom protocol so that these actions can all be captured and verified and indicated in the way claimed. But to get over the, I guess we're talking about the second prong of Alice, the inventive concept question, don't we have to do more than what is described and what you've been talking about? Well, yes. I think what, and I'm in my rebuttal time, so I'd like to be brief about this, but I think what has to be done that's more is to essentially direct the claims to something other than a purported abstract idea. Here the district court concluded that supervision and verification was the direction of the claims or the focus of the claims. Well, isn't that pretty reasonable considering in Claim 1 it says a method for remote supervision and verification of pharmacy functions? Well, but the remote aspect is really the crux of the matter. That is the entire purpose of this invention. It's what makes it a solution to a problem. It's why the Texas board said it was innovative. And when we're looking at individual elements, as the district court did- You can have a lot of computerization of real world things that are innovative and useful and can make a lot of money that still aren't patent eligible because they're computerizing a business method. Well, but again, Your Honor, I think the computerizing of a business method, the idea of something like that failing under Prong 2, has been because the practice itself was just a routine, well-known, conventional function. Looking at the ordered combination of all of these steps together, it's very clear on this record that it had never been done, that this was the first time that this inventor essentially created this infrastructure for it to be done. And between the evidence in the code itself, the evidence from Dr. Anderson, at a bare, bare minimum, with this factual question of what was well-known, what was conventional, what was routine, we think the district court could not possibly properly grant summary judgment. Are you saying, Mr. Green, that what takes this out of the abstract area, the first prong of the Alice test, is that you would say, yes, review and verification is an abstract, known concept. But what makes it not abstract here is that it's being applied in this pharmacy, pharmacist review situation. Well, it's more than that, Your Honor. These claims reflect a very specific, to the extent they're directed to supervision and verification, this is a very specific application of that idea and an implementation of it to solve a specific problem. It's not just that it's limited to sterile compounding. It's limited to reviewing non-pharmacist work of sterile compounding in an institutional pharmacy. What kind of problem is it solving? It's solving the problem that these types of sterile compounded medications need to be available to patients when they're necessary. Pharmacists are required to supervise that process and verify the drug, but pharmacists are not always going to be available. Why are pharmacists required to supervise that process? Well, there are regulations in place. So it's solving a legal problem. It is solving, well, it's solving a legal problem in the sense that the code requires it, but there is also, there's a difference between the process of just sterile compounding and the process of making a sterile compounded drug that's acceptable for being given to a patient. And the result of this process is not just a drug, but a verified drug that's appropriate to be placed into pharmacy stock. The claims even mention that that is the purpose of this method. I'm well into my rebuttal time. If there are no questions, I'd like to reserve some of that. Thank you. Thank you, Your Honor. Mr. Abernathy. Yes, Your Honor. May it please the court. This is a simple case presenting a straightforward application of ALICE, and the element of verification software, I think, proves the point. The specification in column nine, line 46, specifically refers to off-the-shelf software that can be used to perform the claimed functions. There is nothing in the claims or in the specification indicating that the inventor came up with a new form of software to perform any type of pharmacy functions. So you, I think, were quoting or paraphrasing column nine, is it? Yes, Your Honor. Line what? I think it's line 46, Your Honor. Line 45, to be more specific. Is that the same? It says off-the-shelf video conferencing and or collaboration software. Is that the same thing as verification software? Correct, Your Honor. It says so in column nine, line 28 through 30. In some embodiments, the pharmacist may remotely verify pharmacy work via a real-time collaboration tool, and then it talks about that tool being the software. Moreover, Your Honor, in the district court, when the lower court asked what was it that the software did that was inventive, counsel for BD said, the software in this case facilitates the review of the images as they are transmitted. In other words, the software transmits data, in this case, digital data, and that, Your Honor, is not new or inventive, certainly not transformative. Moreover, at the claim construction. So just to try to be concrete about one of the things that, for example, verification software doesn't do. It's not performing any mathematical algorithms or checking any chemical or pharmaceutical resource to confirm that the things that were captured in the images and sent meet some sort of proper standards. Correct. There's no indication in the patent that it's doing that. Those functions are nowhere described in the claims or the specification. So again, I think what the software does, based on the claims, is... So what if you hypothetically had software that kind of, you had a specific kind of table set up where the software could determine how much of a certain ingredient, how much of a certain thing you took out, or how many pills or something like that, and it independently, apart from the video stream, would let the pharmacist know that they're putting these pills together or making proper compositions, and it describes specifically this software will weigh the amount or measure the liquid amount and go through and verify that all the proper measurement steps and stuff is taken. Would that software be patent eligible? Under that hypothetically, Your Honor, I think, depending on how the claim was presented and the supported specification, it sounds like it would be, but that's not found in the specification or the claims. At the district court during claim construction, BD argued that the algorithm for the software was found in the claims themselves. Referring to Claim 1, the software functions in Claim 1 essentially relate to transmitting a picture and then transmitting data of verification. That's the algorithm. That's what they said the software does. They also said the software was simple and not complex, or not complex and straightforward. But there's nothing in the claim that shows that any new software was invented as opposed to simply software that transmits data. Now, counsel referred to the customized software, but the customized software disclosed, for instance, in Column 9, simply transmits data. It may be customized, but it doesn't do anything new or innovative. In what way could it be customized? What do you understand? You just made a distinction, so you must understand something about the term customized. What's in your mind about that? We should probably look at what's in the specification, Your Honor. The specification in that column, in that paragraph around line 45, 46, refers to off-the-shelf software and a customized interface relating to the software. The specification does not explain what that means. It does not describe any additional functionality that that software does. It simply says you can have off-the-shelf software and custom software. But interestingly, in Column 9, the functions are the same. The software transmits data. The data is either digital data, a picture or video, or some sort of verification data that the pharmacist had, in fact, approved the process. But there's no improvement on the software. So the fact that the software is custom or customized takes this nowhere in terms of ALICE. So, Your Honors, the bottom line in this case is in the background of the invention, the patentee indicated that supervision and verification of pharmacy functions, including sterile compounding, were required and long required. The remote aspect is implemented through, as the specification says, off-the-shelf computers, off-the-shelf computer networks, and off-the-shelf conventional software, all performing their expected functions. This is a classic case where ALICE would apply. And, Your Honors, if you have no other questions, that's my presentation. Thank you. Thank you, Your Honor. Why don't you take three minutes for rebuttal. Thank you very much, Your Honor. The first point, Mr. Abernathy had said that Column 9 indicates that all of this verification software is off-the-shelf. As we pointed out in the gray brief on page 16, that reference to off-the-shelf software refers to videoconferencing and or collaboration software. That is referenced very separately and apart from what's described elsewhere in the specification as the custom verification software for facilitating other of the claimed functions. And overall, Mr. Abernathy focused on, like the district court did, individual steps, which is only one part of ALICE Step 2. The ordered combination of all of this together is a process that was not done in pharmacy. It was actually not done. There's nothing in the record that this kind of remote supervision and verification was done in any other field. There are some examples of lawyers need to be supervising their subordinates, teachers need to be supervised, and so forth. None of that shows any remote supervision or verification of any kind. So on this record, there really is a dearth of evidence on the part of Baxter, despite it being its burden. And furthermore, as I mentioned before, the 2001 code was the first time that certain limited non-sterile compounding functions were even permitted in that state. But let's take a step back and look at what the quality of this evidence is. We are talking about one statute from one state only a few years before this application was filed. Now, that one statute doesn't even teach or suggest or indicate what is in these claims. But even if it did, that cannot rise to the level of showing a well-known routine and understood practice. When the courts have considered what is a well-known routine and understood, we're looking for something, some sort of proof that it's been done for a long time, some sort of proof from an authoritative source of what's been done in a widespread way. Here, the 2001 code shows a few limited telepharmacy activities that have nothing to do with the actual process of sterile compounding, but only looking at the finished drug and seeing if it's the right medication being handed out to the patient. That's a far cry from what these claims cover. And again, on this posture, the district court was supposed to give Becton Dickinson the benefit of viewing all the evidence in the light most favorable to Becton Dickinson. On that factual question, what was well-known, what was routine, the ordered combination of all of these steps together, of all the components put together, of all the verification software does, of all the human interaction on both sides with this system, that was not shown to be conventional. It was Baxter's burden to show it, and the district court was supposed to credit our evidence with any benefits of the doubt.  So that these factual issues of conventionality can be resolved by a jury. If there are no further questions, I'll yield the rest of my time. Thank you. Thank you, Your Honor. And the case is submitted.